# GARY S. VILLANUEVA
ATTORNEY AT LAW
11 PARK PLACE, SUITE 1601
NEW YORK, NEW YORK 10007
(212) 219-0100

FAX (212) 219-3701
GARYVILLANUEVA@AOL.COM

November 1, 2016

**By ECF and Fed Ex**

The Honorable Joseph F. Bianco
United States District Judge
Eastern District of New York
1040 Federal Plaza
Central Islip, New York 11722

Re: United States v. Arnolvin Umanzor Velasquez
    Docket No. 15-087 (S-1) (JFB)

Dear Judge Bianco:

I represent Arnolvin Umanzor Velasquez in the above referenced matter. I write to comment on the Pre-Sentence Investigation Report and to urge the Court to impose a sentence below the advisory guideline. In support Mr. Velasquez respectfully requests that the Court consider the following mitigating factors: that he accepted responsibility for his actions and entered a guilty plea thereby saving valuable judicial resources; his age and its attendant characteristics at the time of the conduct; the coercive impact of gang rules and culture; his extraordinary steps toward post conduct rehabilitation, which includes an escape from the New York area to Georgia, where as a a married father he held two different jobs, paid taxes and raised his children which we submit is the clearest indicator that Arnolvin Velasquez rejected the gang and turned a corner in his life toward rehabilitation. The Court is authorized to consider these factors in imposing a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553 (a).

I. Guilty Plea

Arnolvin Velasquez entered into a negotiated plea agreement with the government, in which he accepted responsibility for his

The Hon. Joseph F. Bianco
page 2
November 1, 2016

criminal conduct. In so doing, Arnolvin Velasquez saved limited judicial and prosecutorial resources. He also came to terms with his conduct and in an open court, in front of his family admitted his conduct. This is a significant step in Arnolvin's rehabilitation and ultimately his redemption.

II. History and Characteristics, 18 U.S.C. § 3553 (a)

As a child, Arnolvin Umanzor Velasquez was abandoned by his parents, who left him in the care of relatives in El Salvador. Young Arnolvin spent his developmental years in rural El Salvador, living without electricity and in poverty. More significantly, Arnolvin was frequently physically abused by his grandmother. PSR at ¶ 42.

Arnolvin arrived in the United States as a frightened, uncertain twelve-year old boy unable to communicate in English. He was confronted by the proliferation of competing gangs in the neighborhood High School he attended. He was easily recruited into the gang by young men who shared his cultural heritage and language. Unfortunately, Arnolvin faced a New York story as old as the "Jets and the Sharks."[1] It has been repeated by every incoming ethnic group since the Civil War. Young people who perceive themselves as outsiders ban together in groups and form gangs for safety and security. See, James C. Howell and John P. Moore, History of Street Gangs In the United States, National Gang Center Bulletin, BJA, U.S. Department of Justice, May 2010.

Arnolvin was eighteen-years old when the subject conduct occurred. He had been a member of the gang for only a few short months. Only able to speak limited English and working a night job, Arnlvin left school after the eleventh grade. PSR a ¶ 52.

III. Arnolvin's Velasquez Age as a Mitigation Sentencing Factor

Arnolvin's age raises the question of what is the appropriate sentence for a young, borderline adolescent where the Supreme Court has consistently ruled that young people are fundamentally

---

[1] The fictional gang depicted in Westside Story.

The Hon. Joseph F. Bianco
page 3
November 1, 2016

different than adults for sentencing purposes.[2] Although the Supreme Court's decision in *Miller v. Alabama*, 132 S. Ct. 2455 (2012) addresses mandatory life sentences for violent adolescent offenders, it is instructive to the conditions faced by young Arnolvin. Fortunately, Arnolvin does not face a mandatory life sentence here. However, the core characteristics of younger offenders are equally applicable to Arnolvin. As explained by the Supreme Court in *Graham v. Florida*, 560 U.S. 48 (2010) that because juvenile offenders have diminished culpability and greater prospects for reform "they are less deserving of the most severe punishment." *Graham* at 569. The Court recognized the lack of maturity and an underdeveloped sense of responsibility which young offenders suffer which leads "to recklessness and impulsivity," *Roper v. Simmons* 543 U.S. 551 (2005). The Court also observed that young people are more vulnerable to negative influences and have limited control over their own environment and lack the ability to extricate themselves from crime producing settings.

Most importantly, a young person's character is not as well formed as an adult, since his traits are less fixed and his actions less likely to evince irretrievable depravity. In short, young offenders are less blameworthy because of the inherent traits associated with their age. Accordingly, the case for retribution is not as strong with a young person. The deterrence model is less compelling since their immaturity and recklessness make them less likely to consider potential punishment. Finally, the argument for lengthy incapacitation is weaker with younger offenders because of a young person's capacity for change. *Miller* at 2466.

IV. <u>Post Conduct Rehabilitation</u>

Arnolvin Velasquez capacity to change and rehabilitate himself is not merely hypothetical. He has demonstrated actual rehabilitation between the criminal conduct and his arrest four years later. In the time period since this tragic event, he has rehabilitated himself, by

---

[2] Although Arnolvin was eighteen-years old at the time of his criminal conduct we respectfully submit that maturity and brain development does not occur until a person reaches his mid-twenties and therefore the eighteen-year old cut off for sentence treatment does not fit into Supreme Court Jurisprudence, See *Graham v. Florida*, 560 U.S. 48 (2010), quoting *Roper v. Simmons*, 543 U.S. 551 (2005).

The Hon. Joseph F. Bianco
page 4
November 1, 2016

rejecting the gang and criminality, replacing it with marriage, children, legitimate employment, and living a day to day law abiding life.

While in El Salvador in 2011, Arnolvin married Katia Miriye Alvarado. Exh A. They have three pre-school children. PSR at ¶ 46. After the criminal conduct in this case, Arnolvin made a conscious decision to quit the gang and eschew its culture and rules. He avoided contact with gang members and their sympathizers. In 2012, he worked at Optima Foods in Deer Park, New York, always looking over his shoulder afraid that he would be targeted for reprisals. PSR at ¶ 57. Fearful and anxious to escape the threat he moved his family to Georgia in 2013. There he was able to fully turn a corner in his life. He began working as a landscaper and supplemented that with a second job at McDonald's. He was a family man, who worked two jobs, paid taxes, signed up for the Affordable Care Act as required and became a productive and law abiding person. Arnolvin knew that eventually he would have to answer for his criminal conduct, and I submit, that during this period in his life Arnolvin was trying to prove to his family and more importantly to himself, that he changed the course of his life and was remorseful for his criminal conduct.[3]

This change was witnessed by Santos Acosta, who has known Arnolvin since childhood and employed him as a Landscaper when Arnolvin lived in Georgia. In his letter of support Mr. Acosta confirms Arnolvin's work history and his family commitments. He states that he knows Arnolvin as a good husband, and excellent father. Exh. B. In addition, I have enclosed a copy of his pay stubs from Optima Foods as well as pay stubs from Messer Enterprises, LLC, which reflects his position at McDonald's. Exh. C.

Arnolvin's growth, development and rehabilitation has continued through his incarceration. Unlike other gang members, Arnolvin has had no disciplinary issues while detained. PSR at ¶ 47. This is because he no longer considers himself a member of the gang. He has no gang contact or affiliation. He is a member of a Bible Study group at the detention center. Pastor Antonio Escamilla writes that Arnolvin has shown "great zeal and

---

[3] Arnolvin signed a lease, lived, worked and filed taxes under his actual name. This defeats the argument that he was merely running to avoid apprehension. Exh E.

The Hon. Joseph F. Bianco
page 5
November 1, 2016

earnestness" while attending the Bible studies. Exh. D. Moreover, as indicated in the PSR Arnolvin, as one would expect, used marijuana daily as a youngster but with maturity and family responsibilities he has stopped his drug use. As reported by his wife, Arnolvin is a young man who worked two jobs to support his family and regularly attended religious services. It is clear that Arnolvin has a loving wife and family that supports him. This bodes well for his continual rehabilitation and eventual return to his family and his community.

V. Imperfect Coercion Defense as a Mitigating Sentence Factor under 18 U.S.C. § 3553(a)

During his plea allocution, Arnolvin raised the imperfect coercion and duress defense. He raises it again now as a mitigating factor to be considered at sentencing. Historically, courts considered imperfect coercion and duress under Sentencing Guideline 5K2.12. *See United States v. Cotto*, 347 F.3d 441 (2d Cir. 2003). While downward departures are obsolete in a post-Booker sentencing, (and in this case by the terms of the plea agreement) the court may apply those departure guidelines by way of analogy in analyzing the 18 U.S.C. § 3553(a) factors. *See United States v. Miranda,* 505 F.3d 785 (7th Cir. 2007); *United States v. Lofink*, 564 F.3d 232 (3rd Cir. 2009). "In other words, even when the strict letter of the law does not permit a defendant's crime to be excused as a result of duress, the court may properly consider evidence of coercion as a mitigating factor in determining the defendant's sentence." *United States v. Pestana*, 865 F.Supp 2d 357 (SDNY 2011). "Such a departure may be based upon the authority of Guideline § 5K2.12 or independently upon Congress's directives in 18 U.S.C. § 3553 or upon both." *United States v. Gaviria*, 804 F.Supp. 476 (EDNY 1992).

As a mitigating factor, imperfect duress does not need to be absolute as would be the case if it were presented as an affirmative defense and "the court is not confined to the classic definition of duress." *Cotto* at 445. Rather only a "general threat of physical injury or substantial damage to property, and thus reflects a broader conception of coercion than does the affirmative defense." Id. at 446 (internal quotes omitted).

Here, Arnolvin was in absolute fear of his life. He was a member

The Hon. Joseph F. Bianco
page 6
November 1, 2016

of the MS-13 gang, as were the two victims, the Ceron brothers. Gang leaders ordered Arnolvin to commit the crimes in question because they wanted Enston Ceron's brother dead for distancing himself from the gang, not attending meetings, and not "putting in work." PSR at ¶5. Gang leaders wanted Ricardo Ceron dead to prevent retaliation. Id. Arnolvin knew that the same order would be put out against his life if he did not follow the leadership's direction. His duress went far beyond a "general threat of physical injury" as required by the Second Circuit. Arnolvin knew that the punishment for not following gang leadership orders would be death.

It is possible that Arnolvin had some idea before entering the gang that certain crimes would be required of him; however his youthful age, lack of maturity, and lack of options likely prevented him from reasonably assessing the seriousness of the situation in which he would ultimately find himself. As a result, it would be appropriate for the Court to consider his age in conjunction with the high level of duress Arnolvin was under when he committed these crimes as mitigating factors.

VI. Conclusion

Arnolvin is sincerely remorseful about his actions. He has come a long way since these crimes were committed. He has fled the gang, started a family, and joined the workforce. Now that he has escaped the life in which he grew up, he is able to appreciate the seriousness of his actions and is willing to accept the consequences. Arnolvin has shown the capacity to change, in fact, he self-corrected between the time of the crime and his arrest. Now, he wants nothing more than to be a good husband and father to his three children, to have the opportunity to model for them at some point in the future the kind of man he has become.

The Department of Probation's sentence recommendation looks at the criminal conduct, as it must, but underestimates Arnolvin's post conduct rehabilitation. The recommendation fails to give weight to his age, in-maturity and impulsivity, which are hallmark characteristics, which I respectfully submit, caused Arnolvin not to appreciate the risks of joining the gang. Its sentencing recommendation also fails to consider the extraordinary and savage gang violence perpetrated on its members

The Hon. Joseph F. Bianco
page 7
November 1, 2016

by the leadership.[4]

The crimes in question were aberrant, taking place over a short period of time while Arnolvin was young and easily influenced. He was not a supervisor, nor did he play an aggravating role. He was, in fact, in fear for his life if he did not participate. The amount of duress he was under to commit these crimes -- to kill or be killed -- is almost unimaginable.

Arnolvin has learned how to live without the gang and he has proven through his post conduct rehabilitation that there is little chance of recidivism. He accepts full responsibility for his actions and requests the Court consider some of the mitigating factors he has presented here in its sentencing. A guideline sentence of thirty years we submit is sufficient but not greater than necessary to satisfy the goals of sentencing pursuant to 18 U.S.C. § 3553 (a).

Thank you for your consideration.

Respectfully submitted,
Gary S. Villanueva

cc: A.U.S.A. John Durham (By email)
    Arnolvin Velasquez (By regular Mail)

---

[4] As a practical matter Probation's recommendation also ignores the fact that Arnolvin did not shoot at the good Samaritan who approached the Cernon murder scene. This was Arnolvin's first act to distance himself from the gang. PSR at ¶ 7. I believe the government will confirm this fact.