

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JJD:RAT/PGS
F. #2015R00098

610 Federal Plaza
Central Islip, New York 11722

November 14, 2016

**By Hand and ECF**
The Honorable Joseph F. Bianco
United States District Judge
United States District Court
Eastern District of New York
1040 Federal Plaza
Central Islip, New York 11722

Re: United States v. Arnolvin Umanzor Velasquez
Criminal Docket No. 15-087 (S-2)(JFB)

Dear Judge Bianco:

On March 11, 2016, the defendant Arnolvin Umanzor Velasquez, also known as "Momia" and "Lito," a member of La Mara Salvatrucha, also known as the MS-13, an international criminal organization, pled guilty in connection with the December 18, 2011 murders of Enston Ceron and Ricardo Ceron in Brentwood, New York. Specifically, the defendant pled guilty to two counts of Causing a Death Through the Use of a Firearm, in violation of 18 U.S.C. § 924(j)(1). According to the Probation Department, the defendant's total offense level is 42 and he should be sentenced within Criminal History Category I, which together yield an advisory Guidelines sentence of 360 months to life in prison. Pre-Sentence Investigation Report ("PSR") at ¶ 63. The government and the defendant concur with this calculation, which is consistent with the Guidelines estimate in the plea agreement, to which the defendant stipulated.

On November 1, 2016, the defendant submitted a sentencing memorandum ("Def. Mem.") wherein he requested a sentence at the bottom of the advisory Guidelines range, 30 years' incarceration. Def. Mem. at 7. For the reasons set forth below, the government respectfully submits that, after considering the defendant's advisory Guidelines range and the factors set forth in 18 U.S.C. § 3553(a), in particular the seriousness of these offenses, two cold-blooded, execution-style murders, the Court should sentence the defendant to 45 years in prison.

I. **Background**

The defendant's arrest and conviction resulted from an investigation by the Federal Bureau of Investigation's Long Island Gang Task Force (the "Task Force") into a series of violent crimes committed by members of the MS-13 street gang (hereinafter, the "MS-13"). PSR at ¶¶ 1-9. The defendant, who is a self-admitted member of the MS-13, and dozens of other MS-13 gang members have been charged and convicted in a series of indictments with a litany of violent crimes, including dozens of murders and other violent crimes. As set forth in the PSR, the defendant pled guilty to his participation in the December 18, 2011 murders of Enston Ceron and Ricardo Ceron. Additionally, the defendant also committed the April 27, 2011 attempted murder of a rival gang member, who is identified in the PSR as "John Doe #1." The facts and circumstances of both of those incidents are summarized below.

 A. April 27, 2011 Attempted Murder of John Doe #1

In early 2011, the defendant joined the Brentwood Locos Salvatruchas ("BLS") clique of the MS-13. PSR at ¶ 3. In order to prove himself to the gang, Velasquez had to "put in work," that is carry out a shooting of a rival gang member. Id. On April 27, 2011, at approximately 11:00 p.m., John Doe #1 and four friends were socializing outside a house on Maryland Avenue in Bay Shore, New York, when a dark-colored Nissan Altima drove slowly by the group. Id. Several minutes later, Velasquez, who was armed with a .38 caliber revolver, and Jonathan Ayala, who was also a member of the BLS, approached the group and fired several shots, one of which struck John Doe #1 in the back and lodged near his spine. Id. The eyewitnesses helped John Doe #1 into a car and drove him to Southside Hospital, where he was treated for his injuries and survived the shooting. Id.

 B. December 18, 2011 Murders of Enston and Ricardo Ceron

At the time the defendant joined the BLS clique of the MS-13 in 2011, Enston Ceron was a member and the second in command of the BLS clique of MS-13, which was led by Hector Torres. Id. at ¶ 5. Enston Ceron's brother, Ricardo Ceron, was also a member of the MS-13, but he belonged to the Western Locos Salvatruchas ("WLS") clique. Id. During the latter part of 2011, the BLS clique became suspicious of Enston Ceron because he was distancing himself from the gang by not attending meetings or "putting in work" (committing acts of violence) for the gang, and they no longer trusted him. Id. Thereafter, the BLS clique, including the defendant, held a meeting, wherein they discussed the problem with Enston Ceron and decided to kill him. Id. The BLS clique, including the defendant, also decided to kill Ricardo Ceron because they were concerned that he would try to retaliate against members of the BLS clique if Ricardo Ceron learned that the BLS clique had killed his brother. Id. Subsequently, the BLS clique decided that the defendant and Sergio Cerna, another member of the BLS clique, would carry out the murders of the Ceron brothers. Id.

2

On the night of December 17 into the early morning hours of December 18, 2011, the BLS clique held a party at Torres's house, which was attended by the defendant, Cerna, Torres, Edwin Hernandez, who was also a BLS member, Enston Ceron and Ricardo Ceron. Id. at ¶ 6. At approximately 2:00 a.m., the Ceron brothers decided to leave the party, and the defendant and Cerna, who were armed with a .22 caliber handgun and 9mm handgun, respectively, which had been given to them by Torres, asked the Ceron Brothers for a ride. Id. Enston Ceron, Ricardo Ceron, Cerna and the defendant entered a Nissan Altima (the "Altima"), which was owned by the Ceron brothers' mother. Id. Ricardo Ceron drove to the vicinity of Lincoln Avenue and Stockton Streets in Brentwood, New York. Id. When he stopped the car, the defendant and Cerna shot the Ceron brothers. Id. Ricardo Ceron was shot twice, once in the head and once in the right torso, which reentered his head. Id. One .22 caliber bullet and one 9mm bullet were recovered during the autopsy. Id. Enston Ceron was shot twice in the head, and one 9mm bullet was recovered during the autopsy. Id.

After killing the Ceron brothers, the defendant and Cerna exited the car and began fleeing on foot. Id. at ¶ 7. At that time, an individual, who is identified in the PSR as John Doe #3,[1] was driving down Lincoln Avenue and saw the Altima parked on side of road with its lights on. Id. When John Doe #3 stopped his car and looked at the Altima, he saw the Ceron brothers slumped over. Id. As John Doe #3 tried to dial 911, Cerna approached the car and fired several shots, one of which struck John Doe #3 in the chest. Id. John Doe #3 drove away, called 911 and was transported to the hospital. Miraculously, he survived the gunshot wound to his chest. Id. When officers from the Suffolk County Police Department responded to the scene, they found both Ceron brothers dead in the car. Id.

In January 2012, approximately one month after the murders of the Ceron brothers, Torres and other members of the BLS clique were arrested by the Task Force. Around that same time, the defendant fled to his native country of El Salvador. After remaining in El Salvador for a period of time, the defendant returned to the United States and relocated to Georgia.

On May 19, 2015, the defendant was arrested in Flowery Branch, Georgia by members of the Federal Bureau of Investigation on an arrest warranted issued by the United States District Court for the Eastern District of New York, in connection with his participation in the murders of Enston Ceron and Ricardo Ceron and related conspiracy and firearms charges. The grand jury subsequently returned a superseding indictment, which added charges against the defendant in connection with an April 27, 2011 attempted murder of John Doe #1. As set forth above, on March 11, 2016, the defendant pled guilty to two counts of Causing a Death Through the Use of Firearms in connection with the December 18, 2011 murders of Enston Ceron and Ricardo Ceron.

---

[1] The Probation Department's recommendation appears to refer to John Doe #3 as John Doe #4.

3

## II. The Defendant Should Be Sentenced to 45 Years in Prison

For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to 45 years in prison.

### A. Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a). Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]" Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S. 38, 46-49 (2007)). However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a). Id. That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and
>
> (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

### B. Analysis

Here, pursuant to the recent decisions of the Supreme Court, the Court's "starting point and the initial benchmark" should be the advisory Guidelines range of 360 months to life. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

4

As an initial matter, with respect to § 3553(a)(1), it is undisputed that the defendant pled guilty to two extremely serious offenses, the murders of brothers Enston Ceron and Ricardo Ceron, which weighs heavily in favor of a Guidelines sentence. While all murders are serious, the Ceron brothers' murders are even more serious in light of the extensive planning and premeditation, the cold-blooded nature of the executions, and the fact that the brothers were killed, in part, due to the MS-13's concern that Enston Ceron might cooperate with law enforcement authorities. As set forth above, the defendant and several other MS-13 members, including the leader of the BLS orchestrated the murders of Enston Ceron and his brother Ricardo because of Enston's perceived lack of commitment to the MS-13. Specifically, Enston Ceron was distancing himself from the gang and not carrying out acts of violence. As a result of his unwillingness to engage in violent crimes with the MS-13, the BLS clique, including the defendant, held several meetings, determined Enston Ceron to be a potential liability, and decided to kill him. They also decided to kill his brother, who was also an MS-13, to avoid any reprisals after Enston's murder. Still further, while fleeing the scene, the defendant and Cerna observed a Good Samaritan (John Doe #3) arrive at the scene of the murders and they walked back to the car and Cerna fired several shots at John Doe #3.

The seriousness of this incident is further increased by the defendant's conduct following the Ceron brothers' murders. Specifically, notwithstanding the defendant's claim that he acted under "imperfect coercion and duress," Def. Mem. 5-6, which, as set forth below, is undermined by the evidence in this case, including the fact that he attended multiple meetings wherein the murders were discussed in the weeks leading up to the murders, the defendant continued to belong to and associate with members of the BLS clique after the murders. Notably, the morning after the murders, the defendant went to Torres's house to return the .22 caliber handgun he used in the murders. While there, he proudly recounted the Ceron's murders to Torres. The defendant repeated his account of the Ceron brothers' murders to other members of the BLS clique during the ensuing days. Needless to say, in none of these accounts did the defendant claim he had been threatened or forced to carry out the murders. Moreover, according to multiple cooperating defendants, shortly after the Ceron brothers' murders, the defendant got a "BLS" tattoo on his chest, which demonstrated his enhanced status in the gang and continued allegiance to the MS-13 after the murders. The information provided by the cooperating defendants is corroborated by the defendant's post-arrest photographs, copies of which are attached hereto as Exhibit 1, which reflect that the defendant has numerous MS-13 tattoos, including "BLS" on his chest, "Brentwood" across his upper back, numerous skulls (including one with a "13" on the forehead) on his right arm, a spider-web on his left shoulder, and praying hands with rosary beads on his upper back/right shoulder. See Exhibit 1. The defendant's willingness to boast to other gang members about his involvement in a brutal double murder and get a tattoo, only available to MS-13 members who commit violent crimes, evinces his true intent to increase his status within the MS-13 through the commission of extreme acts of violence and belies his assertion of "imperfect coercion."

5

When Torres, Alvarenga and other BLS members were indicted and arrested on federal racketeering charges in January 2012, the defendant fled the New York area. He returned to his native El Salvador for a period of time. While in El Salvador, the defendant continued his association with the MS-13. When he thought it was safe to return, he briefly came back to the New York area before relocating to Georgia. The defendant's travel to El Salvador and Georgia was not driven by a desire to leave the gang, but rather self-preservation and his desire to avoid responsibility for his conduct by being arrested by federal law enforcement authorities.[2] In fact, by early 2012, almost all of the active members of the BLS clique (from the defendant's generation) either had been arrested or fled the jurisdiction.[3]

Still further, while the defendant claims that he was pressured to carry out the murders of the Ceron brothers, this claim is undermined by the evidence in this case. See Def. Mem. at 5-6. Simply put, the defendant was not under coercion or duress at the time he and Cerna carried out the Ceron brothers' executions. As set forth above, the defendant knowingly, intentionally, and willfully joined the MS-13 gang in early 2011 with full knowledge of the purposes and means of operation of the gang, including killing rival gang members and MS-13 members who violate the gang's rules. Soon after joining the MS-13, the defendant demonstrated his allegiance to those sinister objectives by attempting to murder John Doe #1 and shooting him in the back with a .38 caliber revolver. Additionally, beginning in the Fall of 2011, the BLS clique had concerns about Enston Ceron and decided

---

[2] The defendant claims that he "signed a lease, lived, worked and filed taxes under his actual name," which he claims "defeats the argument that he was merely running to avoid apprehension." Def. Mem. at 4, fn. 3. The defendant's argument in this regard is overstated to the point of being misleading. The attachments to the defendant's sentencing memorandum support an opposite conclusion, that the defendant intentionally used misspelled or out of order versions of his name to avoid detection by law enforcement authorities. For example: (1) the pay stub from Optima Foods, Inc. is in the name "Arnolvyn Umanzor"; (2) the pay stub from Messer Enterprises, LLC is in the name of "Arnalvin Velasquez Umanzor"; (3) the lease appears to be in the name of "Velasquez Umanjor," with a signature of "Arnolvin [illegible]". Def. Mem., Exhibits C and D. Additionally, while the defendant claims to have moved to Georgia in 2013 because he was "fearful and anxious," his 2013 federal income tax return, filed in March 2014 to obtain a significant refund, claimed an address in Bay Shore, New York. Id., Exhibit C. Still further, at the time of his arrest, the defendant was in possession of a Georgia identification card with the (incorrect) name of "Arnalvin Velasquez Umanzor."

[3] For example, the BLS members referred to above, Torres, Alvarenga, Ayala and Hernandez were arrested on federal charges in 2011 and 2012. Cerna was in hiding and Jerry Reyes fled the jurisdiction to Florida.

6

to kill him and his brother Ricardo. The defendant was present for multiple meetings and discussions and volunteered to carry out the murders. Moreover, several weeks passed between the decision to kill the Ceron brothers and an opportunity to carry out the plan. That opportunity arose on December 17-18, 2011, when the brothers attended the party at Torres's house. There is no evidence, other than the defendant's claims, that he was "in absolute fear for his life," Def. Mem. at 5, or that he was threatened or coerced in any way whatsoever to kill the Ceron brothers. Rather, the evidence provided by multiple cooperating defendants is that the defendant participated in the decision to kill the Ceron brothers and he readily accepted the role of being one of the members of the execution team. Moreover, at no point, before or after the plan to kill the Ceron brothers was hatched, or after the murders, did the defendant report the purported threats which caused his "duress," the plot to murder the Ceron brothers, or any of the crimes he was allegedly forced to commit to any law enforcement agency during the more than three years that passed after the killings until he was arrested. As set forth above, the government respectfully submits that the defendant minimized his conduct during his plea allocution before the Court and he has continued that minimization in his sentencing memorandum in order to try to obtain a reduced sentence. The Court should consider the defendant's minimization efforts when determining whether to award him a third point for acceptance of responsibility and where within the Guidelines range he should be sentenced.

In an effort to minimize the seriousness of his conduct, the defendant has attempted to portray himself as a victim. The defendant is not a victim; he created victims. The victims in this case are John Doe #1, Enston Ceron, Ricardo Ceron and John Doe #3 - not to mention the dozens of other victims killed or injured, or thousands of others forced to live and raise families in this District in an environment of violence and fear created by the MS-13. To the contrary, the defendant is a man who refuses to take full responsibility for his actions, minimizes his conduct, repeatedly endangers society, and is easily influenced into committing extreme acts of violence. Accordingly, all of this evidence establishes that society must be protected from the defendant for a significant period of time, which justifies the 45-year sentence recommended by the government.

Likewise, the government respectfully submits that the history and characteristics of this defendant warrant a 45-year sentence. Although the defendant has no prior criminal convictions, as set forth above, the Ceron brothers' murders were not the first crimes of violence he committed. Approximately eight months earlier, in order to join the MS-13, the defendant attempted to murder John Doe #1, shooting him in the back with a .38 caliber handgun. While John Doe #1 survived that shooting, the defendant demonstrated a considerable lack of remorse, continued his membership in the MS-13, and engaged in increasingly serious conduct; namely, the Ceron brothers' murders. Throughout 2011, the defendant continued his membership in the gang and into 2012 when other members of the gang were arrested and he fled the jurisdiction. Moreover, as set forth above, after carrying out the Ceron brothers' murders, the defendant reaffirmed his membership in the MS-13 by

adding a BLS tattoo on his chest, to accompany his numerous other MS-13 related tattoos, which serve as a symbol that he has committed acts of violence on behalf of the gang.

Additionally, the defendant bases his request for a reduced sentence on the fact that he was 18 years-old at the time he killed the Ceron brothers and, he claims that the factors set forth in the Supreme Court's decision in <u>Miller v. Alabama</u>, 132 S. Ct. 2455 (2012), should apply to him. While, of course, the Court can consider the defendant's age at the time of the offenses, the government respectfully submits that factor should be given little or no weight here. First, the defendant's sentencing memorandum claims that the defendant's decisions to join the MS-13 and participate in the Ceron brothers' executions were the result of "in-maturity and impulsivity." Def. Mem. at 6. However, the defendant's attempts at minimization should be summarily rejected, as these murders were not "reckless" or "impulsive," but, instead, were premeditated, cold-blooded executions. Specifically, the evidence in this establishes that the BLS clique held a series of meetings to discuss Enston Ceron's non-compliance with the rules of the MS-13. The defendant attended those meetings and was part of the discussion and decision to kill both Enston and Ricardo Ceron. After making the decision to kill the Ceron brothers, the defendant agreed to be a part of the hit-team, along with Cerna, and the BLS clique waited for an opportunity to carry out the murders. That opportunity arose on December 17-18, 2011, when the MS-13 members lured Enston and Ricardo Ceron to a party to celebrate Enston's birthday. The defendant and Cerna obtained two handguns from Torres, asked the Ceron brothers for a ride and then callously executed them from the back seat of the vehicle. The Ceron brothers' murders were not reckless, nor impetuous. Further, the defendant's actions after the murders also undermine the defendant's claim. After the murders, the defendant showed no remorse but returned the firearm to the clique and got a BLS tattoo to demonstrate his membership. When other members of his clique, including Torres, were arrested the following month, the defendant fled to El Salvador, where he lived for a period of time before returning to the United States and relocating to Georgia. Just like the Cerons' murders, the defendant's flight from justice was logical, carefully planned, and motivated by a concern that he would be arrested and held responsible for his actions, not a fear of the MS-13.

Further, the defendant claims that his personal history, in particular his difficult upbringing in El Salvador and adjustment to life in the United States, supports a sentencing reduction. Def. Mem. at 2. However, the defendant's difficult upbringing in El Salvador was not unique and does not distinguish him from countless other Salvadoran immigrants, who come to the United States, legally or otherwise, but do not join or, in the defendant's case, continue to affiliate with the MS-13 street gang and do not commit murders and other violent crimes. As conceded in the defendant's memorandum, the defendant lived in the United States for approximately six years before he joined the MS-13 and, rather than taking advantage of the educational and employment opportunities in this country, he joined the MS-13 and committed brutal acts of violence.

Thus, the "nature and circumstances of the offenses" and the "history and characteristics" of the defendant both strongly warrant a sentence of 45 years in prison, pursuant to § 3553(a)(1).

The Court must also consider the factors set forth in § 3553(a)(2)(A)-(C), which provide that a sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These factors also weigh heavily in favor of a Guidelines sentence.

First, with respect to factor § 3553(a)(2)(A), for the reasons set forth above, the execution-style murders of Enston Ceron and Ricardo Ceron are extremely serious offenses and need to be adjudicated in a manner that will promote respect for the law and provide just punishment for the offenses. These offenses are more serious because they were committed in furtherance of the MS-13 racketeering enterprise by the defendant and other MS-13 members.

Second, in regard to factor § 3553(a)(2)(B), affording adequate deterrence to criminal conduct, Long Island has been plagued by gang violence over the past several years; especially violence perpetrated by members of the MS-13. In a series of indictments since 2010, which have been assigned to Your Honor, MS-13 members and associates have been charged and convicted in connection with more than 30 murders in the Eastern District of New York. A sentence of 45-years in prison would send a strong message that violent conduct such as that engaged in by the defendant and his fellow MS-13 gang members will not be tolerated.

Third, pursuant to § 3553(a)(2)(C), it is essential that the Court's sentence "protect the public from further crimes of the defendant." As set forth above, the defendant joined the MS-13 in early 2011, attempted to kill a rival gang member, shooting him in the back with a .38 caliber revolver, continued his membership in the gang, volunteered to kill Enston and Ricardo Ceron, and helped carry out their executions, all of which makes him a greater risk of being a recidivist and committing additional violent crimes in the future. Moreover, the fact that the defendant is attempting to claim that he was coerced or forced to carry out the Ceron brothers' murders demonstrates that he has not truly accepted responsibility for his conduct and his not remorseful. The Court should consider these claims and the degree of the defendant's acceptance of responsibility, or lack thereof, in determining his sentence.

### III. Conclusion

The defendant pled guilty to participating in two, cold-blooded execution-style murders on behalf of the MS-13. While he pled guilty, the defendant has continued to minimize his responsibility for these extremely serious crimes. Accordingly, the government respectfully submits that the Court should sentence the defendant to 45 years in prison.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By: _____
John J. Durham
Raymond A. Tierney
Paul G. Scotti
Assistant U.S. Attorneys
(631) 715-7851/7849/7836

Exhibit 1 (Tattoo Photographs)

cc: Gary Villanueva, Esq. (By ECF and email)
USPO Helen Georgopoulos (By email)

# EXHIBIT 1





