UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


------------------------------X

UNITED STATES OF AMERICA,          :
                                          CR-15-0087
        -against-                  :
                                          United States Courthouse
ARNOLVIN UMANZOR VELASQUEZ,         :   Central Islip, New York

           Defendant.              :   November 15, 2016
                                          2:48 p.m.
------------------------------X


             TRANSCRIPT OF SENTENCING
      BEFORE THE HONORABLE JOSEPH F. BIANCO
         UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

For the Government:          ROBERT L. CAPERS, ESQ.
                             UNITED STATES ATTORNEY
                             610 Federal Plaza
                             Central Islip, New York 11722
                             BY:   JOHN J. DURHAM, ESQ.
                                   RAYMOND TIERNEY, ESQ.
                                   PAUL SCOTTI, ESQ.

For the Defendant:           GARY S. VILLANUEVA,ESQ.
                             11 Park Place, Suite 1601
                             New York, New York 10007




Official Court Reporter:     Ellen S. Combs, CSR
                             100 Federal Plaza - Suite 1180
                             Central Islip, New York 11722
                             Phone (631) 712-6107
                             Fax (631) 712-6123


        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED BY CAT

1    (The following took place at 2:48 p.m.)

2    THE CLERK:  Calling case 15-CR-87, USA vs

3    Umanzor Velasquez.

4    Counsel, please state your appearance for the

5    record.

6    (Appearances above noted.)

7    THE COURT:  Mr. Umanzor Velasquez is present

8    with the assistance of the Spanish interpreter who is on

9    staff here.  I'll just ask that she identify herself for

10   the record.

11   THE INTERPRETER:  Good afternoon, your Honor.

12   Maya Gray, Spanish interpreter.

13   THE COURT:  Good afternoon, Ms. Gray.

14   We are here for sentencing.  Are both sides

15   ready to proceed?

16   MR. DURHAM:  Yes, your Honor.

17   MR. VILLANUEVA:  Yes, your Honor.

18   THE COURT:  I just want to review the

19   documentation that the court has and make sure I received

20   everything you have submitted.  I also want to make sure I

21   have everything that is before the court.

22   I did receive, obviously, the presentence

23   investigation report and the recommendation of 45 years in

24   jail.

25   I received Mr. Villanueva's sentencing letter of

1  November 1st with attached letters in support of the

2  defendant, as well as certain records to establish his

3  working in Georgia, and other exhibits.

4       I have received the government's November 14th

5  letter and exhibit attaching certain tattoos.

6       And I have received a letter from the defendant

7  which sounds like a motion for 30 years.  And probation

8  was written on top, but it was filed in April 4th of 2016.

9  Obviously I have considered that as well.

10       Anything else the Court should have in

11  connection with sentencing from the government?

12       MR. DURHAM:  No, your Honor.

13       MR. VILLANUEVA:  No, your Honor.

14       MR. DURHAM:  And Mr. Villanueva, have you and

15  your client seen the presentence report and the

16  recommendation?

17       MR. VILLANUEVA:  We have, your Honor.

18       THE COURT:  And did you have sufficient time to

19  discuss it?

20       MR. VILLANUEVA:  Yes, I have.

21       THE COURT:  Let me just confirm that.

22       Mr. Umanzor Velasquez, have you had sufficient

23  time to; first of all, have you received and reviewed the

24  presence sentence report and the recommendation?

25       THE DEFENDANT:  Yes.

1    THE COURT:  And have you had sufficient time to

2  discuss it with Mr. Villanueva?

3    THE DEFENDANT:  Yes.

4    THE COURT:  Okay, before I deal with objections,

5  just one thing I want to clarify based on my own reading

6  of the presentence report.  Obviously I want to make sure

7  we're all on the same page.

8    The defendant pled guilty in connection with the

9  murder of the Ceron brothers.  The presentence report also

10  makes reference to an attempted murder of John Doe Number

11  1 in April of 2011.  And I want to make sure we're on the

12  same page.  Understand I am considering that as relevant

13  conduct in connection with this sentencing.  However, I

14  just want to confirm that although it is mentioned in

15  connection with the Ceron brothers' murder, the attempted

16  murder of John Doe Number 3, based upon a description in

17  the presentence report, it doesn't indicate any action by

18  Mr. Velasquez.  So I would not consider that as relevant

19  conduct.  Because for example, if he fired any shots in

20  connection with the shooting of John Doe Number 3.

21    So I just want to make sure we're all on the

22  same page on both of those things.

23    MR. DURHAM:  I don't think he actually has

24  culpability, however, for purposes of sentencing.  We're

25  not asking the Court to rely on that.  We're not seeking a

1  Fatico Hearing to prove the defendant's guilt in

2  connection with that offense.

3          THE COURT:  Okay.

4          Mr. Villanueva, do you agree and understand, and

5  does your client understand I'm sentencing on the murder

6  of the Ceron brothers as well as the attempted murder of

7  John Doe Number 1, correct?

8          MR. VILLANUEVA:  We do understand that.

9          THE COURT:  So that is what I'm considering.

10 I'm not considering, for reasons stated, that it can't be

11 proved by a Fatico Hearing and the defendant is not

12 agreeing to any consideration of any culpability with

13 respect to John Doe Number 3.  So I'm not considering

14 that.

15         Okay, do you have any objections to the

16 presentence report?

17         MR. VILLANUEVA:  No, your Honor.

18         THE COURT:  Does the government have any

19 objections to the presentence report?

20         MR. DURHAM:  No objection, judge.

21         Just one point of clarification.  On page 1 it

22 has a June 10, 2015 arrest date.  I believe that is the

23 day he arrived in the Eastern District.  He was actually

24 arrested on May 19, 2015 in Georgia.

25         THE COURT:  Is that accurate, Mr. Villanueva?

1          MR. VILLANUEVA:  That is correct.

2          THE COURT:  So I amend it at counsel's request

3    to an arrest date of May 19, 2015.

4          With that correction I adopt the information

5    contained in the presentence report as factual findings by

6    the Court pursuant to United States vs Booker.  The

7    sentencing guidelines are advisory.  They're only one

8    factor the Court is to consider among all of the statutory

9    factors.

10          The total offense level in the presentence

11   report is a 42.  The defendant has no criminal history, so

12   it's Criminal History Category I, which generates the 360

13   months to life advisory range.

14          Do both sides agree that is the calculation of

15   the advisory range?

16          MR. DURHAM:  Yes, your Honor.

17          MR. VILLANUEVA:  Yes, your Honor.

18          THE COURT:  I adopt the calculation in the

19   presentence report in its entirety despite a summary in

20   connection with Count 22, the use of a firearm to murder

21   Enston Ceron.  That's a level 43.  Count 25, use of a

22   firearm to murder Ricardo Ceron.  That's also a level 43.

23          In a multi-count adjustment 2 levels are added,

24   so a level 45.  And since the defendant pleaded guilty in

25   a timely fashion, he is entitled to a 3 level reduction

1 for timely acceptance of responsibility, which results in

2 the total offense level of 42, resulting in an advisory

3 range of 360 to life, 360 months to life.  Obviously it's

4 only advisory.  It's only one factor the Court is to

5 consider among all of the other statutory factors.

6 　　　　　And I'll now hear from both sides as far as any

7 facts you wish to address, or anything you wish to say.

8 Starting with Mr. Villanueva.

9 　　　　　MR. VILLANUEVA:  Thank you.

10 　　　　　Would the Court mind if I go to the podium?

11 　　　　　THE COURT:  Sure.  You may remain seated if you

12 want to.

13 　　　　　MR. VILLANUEVA:  Okay, thank you very much.

14 　　　　　May it please the Court.

15 　　　　　As your Honor just pointed out, Mr. Velasquez

16 entered a guilty plea in this case and in so doing

17 accepted responsibility for his actions, thereby saving

18 the Court considerable time and resources, as well as

19 resources for the prosecution.

20 　　　　　Mr. Velasquez is 23 years old today.  He is a

21 young man who is married, the father of three children,

22 and has a large family who is sitting in this courtroom

23 today in support, right behind us on my right.  His mom,

24 his dad, his siblings, and extended family are all here in

25 support of Mr. Velasquez.

1          As your Honor knows from our sentencing

2     submission we have asked the Court to consider various

3     sentencing factors in mitigation.  We have asked the Court

4     to consider the fact that he entered a guilty plea as a

5     factor, and the fact that he did so publicly in what we

6     believe and submit is a fact of remorse and an act of

7     redemption.

8          In addition, your Honor.  We ask that you

9     consider his age at the time of his conduct, and his age

10    at the time that he joined the gang, which we believe it

11    is significant for the reasons set forth by the United

12    States Supreme Court in cases beginning or culminating

13    with Miller vs Alabama.

14         We have also asked the Court to consider in

15    mitigation what we termed as the perfect duress and

16    coercion.  And we believe the facts and the circumstances

17    of this case demonstrate coercion.

18         And lastly and most significantly we would ask

19    the Court to consider Mr. Velasquez demonstrated

20    post-conduct rehabilitation.  And we believe those

21    factors, in balance with the heinousness of this crime,

22    and it was very serious and heinous, and his age; we

23    believe the Court has the room and the discretion to

24    impose a sentence that is sufficient but not overly harsh,

25    and that demonstrates to the community just punishment for

Mr. Velasquez, but also that gives him hope for what he
has demonstrated, and that, is rehabilitation, his own
rehabilitation.

We raised the post-conduct rehabilitation, age
and duress, not to minimize his conduct, but to give this
Court a sense of the circumstances of his life, and the
circumstances surrounding the commission of the crime.  He
should not be punished more severely because he provided
the Court with the information the Court, we believe,
needs to make a careful sentencing decision.

As the presentence report indicates, your Honor,
the Ceron brothers, there was an order to kill the Ceron
brothers because one of the Ceron brothers, Enston, was
distancing himself from the gang.  And that is a
significant fact.  Because the fact that he was distancing
himself from the gang led the leadership of the gang to
consider and to order his murder.  And the gang also
ordered the murder of his brother, not because the brother
was distancing himself, but because the brother was a
committed gang member, and they feared retribution.

I think we should stop right there and look at
that fact and that fact alone to show what Mr. Velasquez
was laboring under.  He was laboring under a real life
situation where it was kill or be killed.  If they were
going to kill the brother for distancing himself, what

1  would they do to a guy would said, no, to them?  That is a

2  real life circumstance.

3  Now the government will argue that he knew what

4  he was getting into when he joined the gang.  And that is

5  an appropriate argument.  And the Court should consider it

6  for what it's worth.  But he was 17 years old when he

7  joined the gang.  And what we do know from Miller vs

8  Alabama, and all of the other cases about age, is that age

9  has hallmark characteristics that affect a person's

10  blameworthiness, that affect a person's ability to assess

11  risk, that affects his ability to extricate himself from

12  dangerous and terrible circumstances.

13  And we ask your Honor to consider the Supreme

14  Court's instructions to both the District Court and to all

15  of us, that young people are different.  And we submit to

16  this Court that a 17 year old kid could not, and did not,

17  and my client did not assess that risk properly.  And when

18  he was an 18 year old guy, young man, facing that choice

19  of kill or be killed, he killed.  And he stands here sorry

20  for that, and remorseful for that.

21  And what did he do afterwards?  And that's the

22  important thing.  What did he do?  If he was a committed

23  gang member he would have, and if the government is to

24  believe that his entire set was dismantled, that what he

25  would have done as a committed gang member was to go to

1  another set.  And committed gang members don't stop being

2  a gang member.  A committed gang member continues on and

3  on, and he would have done that.

4      But instead Mr. Velasquez became a father.  He

5  got married, obtained legitimate employment, on the books

6  employment, not one job but two.  But he didn't he stop

7  there, your Honor.  He filed taxes.  He applied for

8  healthcare.  He left the environment where the gang

9  thrived and moved to Georgia.  And in Georgia he had two

10  jobs.  And in fact when he was arrested in this very case

11  on May 19th he was on his way to his second job.  And he

12  demonstrated that to your Honor.

13      So what we have, we have a guy who has shown, a

14  young man who has shown through his very actions a desire

15  to rehabilitate himself, a desire to change his life.  And

16  what other indications does the Court have that he has

17  done that?  In the almost four years there was no arrest.

18  In the almost four years, between the murder and today,

19  there was no gang activity that the government can point

20  to.  He didn't do anything else.  And also, your Honor,

21  when he was in the Nassau County Jail for over, almost two

22  years, he has no disciplinary actions, none.  And I

23  believe from this Court's experience, and these types of

24  cases, that is pretty rare and pretty unique.  That is a

25  further action and reflection of Mr. Velasquez's desire to

1    change his life, which he actually did.

2          Now the Court I'm sure is concerned about, as

3    the government is, that he attended meetings. And that

4    his actions after the shooting of the Ceron brothers is

5    questionable.

6          But I ask the Court to consider the following.

7    The fact that he participated in gang meetings and

8    recounted his crimes, and got a gang tattoo, does not

9    negate as imperfect as duress and coercion are on him. To

10    state the obvious, duress does not end at the killing of

11    the brothers.

12          Mr. Velasquez's ongoing enthusiastic

13    participation in the gang should be expected because he

14    was very much aware what would happen to him if he wasn't

15    enthusiastic, if he didn't play a role, if he didn't show

16    that commitment. He would have ended up like the Ceron

17    brothers, I submit to the Court.

18          Now your Honor, I'm not asking that the Court

19    apply the imperfect duress and coercion defense in toto.

20    We believe that it's a mitigating factor, that you can

21    consider it. And if you consider that, and consider the

22    fact that after the Ceron brothers, there's very little,

23    if any, contact between Mr. Velasquez and the gang. And

24    in four years of conduct outside of the gang, his

25    legitimate employment, his lifestyle has changed, the fact

1 | that he is married and committed to his family, we believe
2 | those are the legitimate sentencing factors that you can
3 | consider.

4 | So what have we got? We have a young man who
5 | was in his teens at the time of this crime. We have a
6 | young man who came into this country not speaking the
7 | language, and what is unfortunately, introduced into a
8 | culture that was destructive. And he felt that
9 | destruction. He understands that his conduct is going to
10 | take the majority of his life away from him. And he is
11 | ready to accept that. He understands that. And that is
12 | what he did when he accepted this guilty plea here. He
13 | knows that he is facing an enormous amount of time in
14 | jail. And he deserves it, and he understands that.

15 | But he is asking this Court to give him some
16 | hope. He is asking this Court to provide some hope, not
17 | because of his age, but because of his demonstrated
18 | activities, his demonstrated rehabilitation, his acts in
19 | furtherance of trying to be moral and peaceful, which he
20 | has done; the fact that he is a family man now, the fact
21 | that he has worked two jobs. The fact that he has
22 | legitimate employment and a legitimate lifestyle is
23 | something that he is asking this Court to consider, to
24 | give him hope.

25 | And we believe that a sentence of 30 years to

1  life or a 30 year sentence is such a significant sentence

2  that it does give him that hope.  And it does show the

3  community and demonstrates to the community the

4  seriousness of this offense.

5       But it also demonstrates that we understand that

6  young people are different.  We do understand that young

7  people who get involved in these, this criminal activity

8  sometimes they don't get involved with their eyes open,

9  and a real understanding of what that means.  And that

10  they can change.  And he can change, and he has changed

11  already.  And he is asking you to impose a sentence that

12  reflects his change.

13       Now the government is indicating or suggests

14  that the maximum sentence is required to address similar

15  crimes, crimes that it knows occur regularly in this area.

16  However, Courts have been handing out excessive and very

17  lengthy sentences.  And while that may be satisfying, it

18  is really not having a deterrent effect, as this Court is

19  well aware of the recent violent crimes in this area.  It

20  may be time that we view punishment and rehabilitation in

21  another way.  I'm not sure.  But I do know that I am sure

22  of this; that Mr. Velasquez has demonstrated an ability to

23  live a peaceful and productive life.

24       While he should be punished, and we agree to

25  that, we ask respectfully that the Court consider his

1   post-conduct, rehabilitation conduct, his age and the

2   horrific circumstances that he labored under as an 18 year

3   old when pressed and pushed to make the decision to be

4   involved in the Ceron murders.  It's a difficult question.

5          And lastly, the suggestion that society be

6   protected from Mr. Velasquez, is less than accurate.  He

7   spent four years demonstrating that he is going to live a

8   productive life.  And we ask that the Court consider that

9   four years and that change in his life as a significant

10  mitigator, and consider it in imposing a sentence that we

11  believe will demonstrate to the community the seriousness

12  of this crime, but also give the community and young

13  people like Mr. Velasquez, other young people, that if

14  you're going to turn your, willing to turn your life

15  around, if you're willing to demonstrate that you can work

16  and live and get married and raise a family and live a

17  productive life, that courts will take that into

18  consideration.  I think that is also important.

19         May I have a moment, your Honor?

20         THE COURT:  Yes.

21         (There was a pause in the proceedings.)

22         MR. VILLANUEVA:  I appreciate the time the Court

23  has given me.  And I know that sometimes sentencings are

24  emotional and they are difficult.  I know it's difficult

25  for the Court as well as the parties.  And I appreciate

1  the time.

2          Thank you.

3          THE COURT:  Before I hear from your client, I

4  just want to ask you one question on the imperfect duress

5  defense argument.

6          MR. VILLANUEVA:  Yes.

7          THE COURT:  And obviously that is something the

8  Court can consider, but I just, I don't understand.

9  Assuming that I accept your version of why he left the

10  area and established himself.  Isn't that an argument

11  against your imperfect duress defense?  In other words,

12  you pointing out to me that shortly after the Ceron

13  murders he extricated himself from the gang.  So the

14  obvious question would be, doesn't that prove that he

15  could have done that before the Ceron murders, if in fact

16  he wanted to do that?  He could have, he was involved in

17  the attempted murder in April.  So he certainly knew what

18  the nature of the gang was by that time.  Why didn't he

19  extricate himself then?  And why didn't he before the

20  Ceron murders?

21          MR. VILLANUEVA:  And that is a fair question,

22  your Honor, a very fair question.  And the answer to that

23  is, that is a common sense response.

24          Remember, your Honor, he was between 17 and 18

25  years old.  And while we expect people to act rationally,

1    and be able to assess their conduct and their

2    consequences, what we do know from Miller and Alabama and

3    those other cases, is that young people don't do that.

4    That is the reason why they're less blameworthy.  That is

5    the reason why the Supreme Court has said we need to treat

6    them differently.

7           And I submit to this Court that if we hold him

8    to that standard of reasonableness, then we run afoul to

9    the Supreme Court's jurisprudence for young people.  And I

10   believe that the answer is just very basic.  That as a

11   young person, he is a typical 18 year old who doesn't

12   assess the risk, who is immature, who doesn't understand

13   the consequences of his actions, who takes time to

14   extricate himself from a dangerous and difficult

15   situation.  Those are comments and observations that the

16   Supreme Court lists in their cases.

17          And I think they were speaking to young

18   Mr. Velasquez, and speaking to his predicament and his

19   circumstances.  And I think he is just that typical

20   person.  He didn't get it the first time.  But he

21   certainly got it the second time.  And when I say the

22   second time, I'm saying at the time of the Ceron murders.

23          And I want to point out to the Court, while the

24   government is asking for Mr. Velasquez to be held

25   accountable for the shooting of the, what I call the good

1   samaritan, it's important to note that he didn't shoot

2   that gun at a good samaritan. And that seems to be a

3   suggestion that he was then walking the other way. That

4   the trauma of that incident was the light that he needed.

5   The trauma of what he did was so horrific that he did go

6   the other way. And he did turn the corner. And we do

7   submit that to the Court.

8           I hope I have been responsive to your Honor's

9   question.

10           THE COURT: Yes.

11           MR. VILLANUEVA: Thank you.

12           THE COURT: Mr. Velasquez, you also have a right

13   to speak at your sentencing. You can remain seated. I

14   did obviously review your letter. But you also have the

15   opportunity to speak today if you wish to say anything.

16           THE DEFENDANT: Yes, your Honor.

17           With your Honor's permission, first of all, I

18   ask the family members of the deceased to forgive me from

19   the bottom of my heart. Because I have also made my

20   family suffer; my daughters, my mother, my father, my

21   wife. And I apologize to them.

22           I am suffering because I can not see my family.

23   But I know now that I cannot see them due to my own

24   actions. I am responsible, and that is why they suffer.

25           I distanced myself from the gang. I did not

1  want to participate in bad things.  I wanted to change my

2  life.  I am sorry for what I did.  I am sorry from my

3  heart.  And I ask you, your Honor, to have pity on me when

4  you sentence me.

5          And once again I ask your Honor to forgive me.

6  And may God bless you.

7          THE COURT:  Let me respond to what you said

8  today.  I'm giving you credit for accepting responsibility

9  for what you have done, for showing remorse.  So that

10 deserves some credit.

11         There are people involved in gang activity who

12 sit there even on the day of sentencing and still don't

13 show remorse.  They just show ongoing allegiance to the

14 gang.  So the fact that you have done that deserves some

15 credit.

16         As you know, your lawyer obviously recognizes

17 that there are other things I have to consider; the harm

18 that you have done.  And I see your family back there.  I

19 know your family and you understand how this affects your

20 children, and the problem this creates for them.  But the

21 Ceron brothers are never going to see their family again

22 because of your conduct.

23         So you caused a lot of harm, two people lost

24 their lives.  And the sentence has to reflect that harm

25 that you have done.

1        But I will give you some credit for your

2   acceptance of responsibility and your remorse that you

3   have shown here today.

4        All right, I'll hear from the government.

5        MR. DURHAM:  Your Honor, the defendant has shown

6   some remorse.  However, he continues to refer to his

7   suffering and the suffering of his family, which is, as

8   the Court pointed out, not remotely on par with the

9   suffering of the Ceron family and so many other families

10  who suffer from the violence created by the MS-13.

11        This defendant came to this country when he was

12  12 years old.  He lived here for five years.  He had a

13  tremendous education, employment opportunity, but instead

14  of taking advantage of those opportunities he joined the

15  MS-13, not when he was 12, not when he was 13, but when he

16  was 17 years old.  He joined the gang knowing full well

17  what the rules of the gang were, what they would require

18  of him', specifically violence, violence against rival

19  gang members, violence against MS-13 members who violated

20  the rules.

21        We can not have a situation where people join

22  these gangs knowing the rules throughout, and the horrific

23  acts of violence, and then blame the rules of the gang for

24  the acts they committed.

25        And your Honor asked Mr. Villanueva a very

1  simple question.  He said, well I'll give you a common

2  sense answer.  And he answered it and talked for about

3  five minutes.

4          The common sense answer is, that this defendant

5  could have fled and could have lived a different life at

6  any point before he committed the murders.  These murders

7  were not spontaneous events.  They were not something that

8  happened just the night of December 17th or the 18th.

9  They talked about killing the Ceron brothers for weeks, if

10  not months.

11          This defendant was at multiple meetings when

12  this was discussed.  He had multiple side conversations

13  with other members of the gang.  He knew this was the

14  plan.  He knew he was a member of the team that was

15  supposed to carry it out.  At any point he could have

16  left.  He could have left the gang.  He could have gone to

17  the police.  He could have done many, many different

18  things.  Instead he continued to go to these meetings, he

19  agreed to carry out the murder.  He went to a party on

20  December 17th, and then he got in the car and he put a gun

21  to Ricardo Ceron's head and he pulled the trigger.

22          And after that he continued to associate with

23  the gang up until the point where other gang leaders were

24  arrested and incarcerated.  He then fled out of

25  self-interest, no other reason.

He went to El Salvador. And he was in El Salvador and he touched base with gang members then. He left El Salvador and he returned to the United States. He didn't come to New York, he moved to Georgia. He moved because of self-preservation, not out remorse, not out of rehabilitation. He didn't want to go to jail.

We are asking the Court to hold him responsible for the crimes he committed and to sentence him to 30 years posed by the defense, 15 years for each murder in the government's view is insufficient.

We're asking the Court to impose a sentence of 45 years for all of the 3553(a) factors, and that the Court consider the defendant's age, and consider the other factors as well, specifically the circumstances of this offense. Like I said, it wasn't a spontaneous event. It wasn't impulsive. It was a preplanned, cold-blooded murder.

THE COURT: Thank you, Mr. Durham.

I'm now going to state the sentence I intend to impose. And I'll give the lawyers a final opportunity to make any legal objection before I impose the sentence.

In imposing this sentence I have carefully considered the factors that have been set forth by Congress in Section 3553(a). Those factors include, among others, and I'm not going to go through all of them now,

1  but they include among others the nature and circumstances

2  of the offense, the history and characteristics of the

3  defendant, the need for the sentence imposed to reflect

4  the seriousness of the offense, to promote respect for the

5  law, and to provide a just punishment for the offense.  I

6  also need to afford adequate deterrence to criminal

7  conduct, and to protect the public from further crimes by

8  the defendant.

9      Among the other factors that I have considered;

10  the sentencing guideline issued by the sentencing

11  commission, as well as included the advisory range in this

12  case, as well as the applicable policy statements that

13  have been issued by the sentencing commission.  I also

14  considered the need to avoid unwarranted sentencing

15  disparity among similarly situated defendants.  And I have

16  sentenced a number of individuals for gang-related

17  murders.  I am certainly cognizant of trying to insure

18  that the sentence is proportional to other defendants who

19  are similarly situated.

20      The restitution factor, does the government have

21  any restitution?

22      MR. DURHAM:  No, your Honor.  The victims'

23  family did not file information for us to do so.

24      THE COURT:  And the Court is also considering as

25  both sides mentioned, and I think it is appropriate to

1  consider, although I'm assuming Mr. Velasquez was not a

2  juvenile at the time this offense.  I have considered more

3  the Alabama factors because he was 18 at the time of the

4  offense, and certainly some of the factors the Supreme

5  Court mentioned in Miller could apply to someone at the

6  age of 18.  And I have assessed those factors in the

7  context of this defendant in this case.

8          And having considered all of those factors, in

9  my discretion I intend to impose a sentence of 40 years in

10  prison, 480 months.  And I'm going to explain the reasons

11  for that sentence.

12          I have given the sentence careful thought.  And

13  I can't under-emphasize -- excuse me -- I can't

14  overemphasize the heinous nature of this criminal conduct.

15          First, it was the attempted murder of John Doe

16  number 1 which involved the defendant firing into a group

17  of people hitting John Doe number 1 in the back.  What

18  were these individuals doing that warranted him shooting

19  at them?  They were socializing on Maryland Avenue outside

20  their home.  And because the defendant and some gang

21  members were out for, quote, hunting for what they believe

22  are rival gang members, John Doe number 1 was shot.  But

23  fortunately he survived that shooting.  The defendant

24  could then instead of, after a violent thing like that,

25  dissociating himself from the gang he engaged in this

horrific execution of two brothers in a car in
cold-blooded execution.  The sentence that the Court
imposes has to reflect the loss of two lives in December
of 2011, and the injury to John Doe number 1.

The Court notes that Enston Ceron was killed
because according to the gang he was distancing himself,
as both sides noted.  He wasn't violent enough.  And for
that they executed him.  I view the defendant as an
extremely heinous individual.  I feel the public needs to
be protected from him.

I also am considering the need for general
deterrence.  I don't know what impact the Court's
sentences have on individuals who are involved in gang
activity, including other individuals of Mr. Velasquez's
age who are involved in violent activities, or who are
thinking about engaging in this type of activity.  But
that does not dissuade me from the fact that that message
needs to be sent.

As Mr. Durham noted in his sentencing letter,
this Court alone has watched convictions in the order of
two dozen murders over the past several years by this
violent criminal enterprise, MS-13, all over Long Island
in various communities.  And a message needs to be sent
that if you're involved in that gang activity, and if you
engage in violence including violence as horrific as this,

1  executing two people on the streets of Long Island, you're

2  going to go to jail for a long time, whether you're 20,

3  whether your 22, or whether you're 18 as in the

4  defendant's case.  The need for general deterrence to

5  deter this gang is substantial.

6         I did consider Mr. Villanueva's, as he always

7  does he did an excellent job in his arguments to the

8  Court, and various mitigating factors.  I'm not giving

9  credit for this imperfect arrest offense for reasons that

10 are indicated in my questioning.  The defendant, as

11 Mr. Durham noted, the defendant joined the gang at 17,

12 certainly under the age of 18.  But it's not 13 or 14, as

13 it is when some individuals who join the gangs.  And to me

14 most importantly, as it has been pointed out during my

15 questioning, getting involved in a violent act in April of

16 2011 the defendant did not disassociate himself from the

17 gang and move to another location.  Whether or not if he

18 could have advised law enforcement is a different

19 question.  But at a minimum to disassociate himself from

20 the gang, move out of Long Island, go somewhere that he

21 felt like because of the rules of the gang he chose to

22 join, that he should need to engage in violent activity.

23 And he didn't do that.

24        Instead he was involved in planning, and as

25 Mr. Durham notes this was not a spur of the moment

decision when someone handed him a gun and said, we need

you to shoot the Ceron brothers.  It was explained about

this.  There was discussion about this and he stuck around

to be the shooter, one of the two shooters in that

execution.  Nobody had a gun to his head.  He could have

left the area.

I don't believe that the Miller factors provide

sufficient explanation for his decision to be involved in

that double homicide after having been involved in an

attempted murder just a few months before that.  Even 18

year olds obviously are aware of the consequences of that

type of action, how wrong those actions are, how evil they

are.  And despite the fact that their judgment may not be

that of an adult, they certainly are aware of the nature

of that type of conduct.  And it is not in my view an

explanation for why the defendant continued to be involved

in the violent activity of this gang.

I also note, I think this is obvious, but I just

want to emphasize.  There is no secret when you join the

MS-13 gang where you learn along the way, we are going to

ask you to commit acts of violence.  If you don't want to

commit violence you could be subject to violence yourself.

The MS-13 gang only exists for violence.  It's not like

it's this one activity within the group that involves

nonviolence and this other activity that involves

violence.  The MS-13 gang only exists for violence.

Everybody who joins that gang is aware of what the

objective of that gang is.  And certainly even at the age

of 17 the defendant knew when he joined that gang the only

reason to join that gang is to engage in violent activity.

So it should come at no surprise to him that they asked

him to carry out murders on behalf of the gang.

As I said, I considered his age and the other

factors.  I don't believe they warrant a substantially

reduced sentence in this case for the reasons I have

already indicated.  And the factors, I think overwhelm any

of those factors set forth in the Miller case.

I have considered him leaving the area.

Obviously I can't determine what was in the defendants

mind.  The government has a different reason for him

leaving the area in terms of avoiding prosecution and gang

members were being arrested.  But I do believe he deserves

some credit for not being involved in criminal activity in

the years after the Ceron murders.

There is no indication that he made an attempt

to rejoin the gang.  The government mentioned contact with

gang members in El Salvador, but I am not going to

consider that.  There is nothing in the record for me to

consider that.  So I am considering that mitigating

factor.  Although again, it is overwhelmed by the loss of

1    life here and all of the other factors that I have already

2    gone into.

3         So I considered giving him a higher sentence as

4    requested by the government.  But I believe it was a

5    little too high given the factors I pointed to, acceptance

6    of responsibility and the fact that he did for some period

7    of time start working and had a relationship with an

8    individual, a woman, and had children, and appears to be

9    not engaged in any type of criminal activity for that

10   period of time.

11        I certainly considered giving him less.  In my

12   discretion, and I know Mr. Villanueva is advocating 30

13   years.  But I don't believe anything less than 40 years

14   would properly reflect and balance the need to find a just

15   punishment for the execution of two individuals and the

16   attempted murder of a third individual and the need for

17   deterrence and protection of the public from Mr. Velasquez

18   and from other gang members to hopefully send the message

19   of general deterrence that is sent by this sentence.

20        The final factor that I want to make reference

21   to is the issue of avoiding sentencing disparities among

22   similarly situated defendants.  Again, I have sentenced

23   numerous MS-13 gang members on murders convictions;

24   juveniles, adult.  And I think this sentence is

25   proportional to the other sentences I have imposed.  I

have imposed some life sentences, some of them were
mandatory life, but some of them were discretionary life
sentences, even for juveniles.  But those sentences, that
involved the execution of a 19 year old woman and a two
year old boy.  And for all of the reasons I indicated for
those sentences I believe that conduct warranted that
increased punishment.

In terms of other sentences in this range for
other gang members involved in murders, I have sentenced
them, by way of one example -- was involved in the
execution of an individual, a guard at a restaurant, a
bar.  I sentenced him to 405 months in jail, which is
obviously less than this sentence.  But I believe this
sentence involves a double homicide and attempted murder
and warrants a higher sentence than that particular
sentence.

But in short, I'm not going to go through every
other defendant.  I believe this sentence is proportional
to other sentences I have imposed on other defendants
under similar circumstances, under the factors that I have
mentioned.  So that is how I arrived at this sentence.

I intend to impose 40 years on each count
concurrent to each other.  I do intend to impose five
years of supervised release, although the defendant may be
deported or removed from the United States.  Given his

1   ties to the country, including children, and obviously

2   this is a long sentence, but given his ties to the United

3   States, his family members, even assuming he is removed

4   from the United States because of this conviction, I

5   believe a period of supervised release is necessary to

6   insure that he does not attempt to return to the United

7   States to reestablish his ties.  Because doing so would be

8   not an additional crime, but a violation of the conditions

9   of release.  And if he is in the United States for any

10  period of time, he should be under supervision given his

11  criminal activity and the special conditions that would be

12  necessary to insure that he doesn't return to gang

13  activity.  So I want to impose those, as well as in the

14  unlikely event that he stays in this country legally for

15  any period of time.

16          So that is the sentence I intend to impose.  And

17  I intend to impose no fine.  I do intend to impose a $200

18  special assessment, $100 on each count.  I'm imposing no

19  fine because the defendant has no ability to pay a fine.

20          I intend to impose no restitution.

21          Any legal reason why I cannot impose that

22  sentence?

23          MR. DURHAM:  No, your Honor.

24          THE COURT:  Mr. Velasquez?

25          MR. VILLANUEVA:  No, your Honor.

1    THE COURT:  Mr. Velasquez, the judgment of this

2  court in its discretion is that you be sentenced to the

3  custody of the Attorney General through the Bureau of

4  Prisons to a term, total term of imprisonment of 40 years

5  or 480 months, consisting of 480 months on Count 22, and

6  480 months on Count 25, to run concurrently to each other.

7    I impose five years of supervised release on

8  each count which runs concurrently to each other under

9  operation of law.  I impose the standard conditions and

10  the following five special conditions.

11    1.  You shall not possession a firearm,

12  ammunition or destruction devise.

13    2.  You shall submit your person and property;

14  house, residence, vehicle, computers as defined in 18 USC

15  Section 1030(e) or other electronics, communications or

16  data storage devices or media or office to a search

17  conducted by a United States probation officer.  Failure

18  to submit to a search may be grounds for revocation of

19  release.

20    You shall warn any other occupants that the

21  premises may be subject to searches pursuant to this

22  condition.  An officer may conduct a search pursuant to

23  this condition only when reasonable suspicion exists that

24  you have violated a condition of supervision, and the area

25  to search contains evidence of this violation.  Any search

1  has to be conducted at a reasonable time and in a

2  reasonable manner.

3         3.  You shall not associate in person, through

4  mail, telephone or electronic communication with any

5  individual with an affiliation to any organized crime

6  groups, gangs, or other criminal enterprise, pursuant, but

7  not limited to a prohibition list provided by the US

8  Probation Department, nor shall you frequent any

9  establishment or other locale identified by the US

10  Probation Department as a location where these persons or

11  groups may be.

12         4.  You shall cooperate with and abide by all

13  instructions of immigration authorities.

14         And 5.  If deported you may not reenter the

15  United States illegally.

16         I impose no fine.  And I impose a $100 special

17  assessment on each count for a total of $200.  And I

18  impose no restitution.

19         Mr. Umanzor Velasquez, I need to advise you of

20  your statutory right to appeal.

21         To the extent that you did not waive your right

22  to appeal in your plea agreement, you have a statutory

23  right to appeal your conviction and sentence.  If you can

24  not afford to pay the cost of the appeal you may apply to

25  appeal forma pauperis.  If you could not afford an

1  attorney, one will be furnished to represent you on

2  appeal.  The notice of appeal must be filed within 14 day

3  of the judgment of conviction.

4         Mr. Durham, do we need to dismiss any open

5  counts?.

6         MR. DURHAM:  We do, your Honor.

7         We move to dismiss any open counts in the second

8  superseding indictment, as well as the first superseding

9  indictment.

10        THE COURT:  All right, all the open counts are

11 dismissed.

12        I'll say this to the defendant's family who are

13 here today.  I know you support the defendant.  I don't

14 want my substantial sentence here to be a reflection that

15 I didn't consider their letters and their support of the

16 defendant.  I understand that they love the defendant and

17 support him.  But the harm done and the other factors that

18 I mentioned just overwhelmed the fact that he has family

19 to support him when he gets out.

20        I expect them be there when he gets out.  But

21 these other factors that I pointed to warrant this

22 sentence in my discretion.  But I certainly understand

23 their support of the defendant.  Certainly he is lucky to

24 have them, his family members.

25        All right, is there anything else from the

1  government?

2          MR. DURHAM:  No, your Honor.  Thank you.

3          THE COURT:  Anything from the defense?

4          MR. VILLANUEVA:  No, your Honor.

5          THE COURT:  All right, thank you.

6          (The proceedings were concluded at 3:40 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25